TERRI F. LOVE, Judge.
| Jerome Jones appeals his conviction and sentence for armed robbery, requesting a review of the record for errors patent only. Finding no errors that require correction by this Court, we affirm Mr. Jones’ conviction and sentence.

PROCEDURAL HISTORY

The State of Louisiana charged Jerome Jones on April 1, 2009, with one count of armed robbery. He pled not guilty to this charge at his arraignment two days later. On April 7, 2010, Mr. Jones waived his right to a jury and proceeded to a bench trial. After two days of testimony, the trial court judge found him guilty as charged. The trial court judge sentenced Mr. Jones on April 28 to serve ten years at hard labor.[1] The trial court judge also granted Mr. Jones’ motion for appeal on that date.

FACTUAL BACKGROUND/TESTIMONY

Two men robbed Daniel Dominici at approximately 1:30 a.m. on January 20, 2009, as he was getting out of his car in the 400 block of Natchez Street. Mr. Dominici testified that he parked his car on the way to a casino, when two African-American males approached him from a nearby doorway to a closed [¿restaurant. One man pointed a gun at him and demanded his money, cell phone, and the keys to his car. Mr. Dominici complied with their demands and handed them his phone, his wallet containing approximately $320, his hooded shirt, and his keys. The men ordered him to lie down on the ground, and when he complied, they pushed him under the car. The men tried to start the car while he was under it, but it would not start. In order to get out from under the car, Mr. Dominici told them that he had another battery in the trunk. The robbers allowed him to get up, and he obtained the other battery and hooked it up, but the car still would not start. The men then walked away.
Mr. Dominici testified that he ran down Tchoupitoulas Street to Canal Street, where he saw a police car sitting at a red light. He told the police officer that he was robbed. As the police officer was *1204 driving Mr. Dominici back to the scene, he saw a white Kia Spectra being driven the wrong way down Tchoupitoulas, and the men who robbed him were inside. The Kia turned on Canal Street and fled. Mr. Dominici testified that he also spoke with Detective Sean McElrath, who responded to the robbery call. Mr. Dominici described the gunman as having dreadlocks with gold tips at the end. He could not remember what other description he gave to Det. McElrath.
Some days later, Mr. Dominici viewed a photographic lineup from which he chose the picture of Mr. Jones as the robber with the gun. He testified that the photographs of all six men in the lineup were covered with paper so that he could not see the men’s hair, and Det. McElrath instructed him to look' at the men’s features to see if he recognized anyone. Mr. Dominici testified that months later he viewed a second lineup, from which he chose a photograph of whom he thought was the second robber.
lsOn cross-examination, Mr. Dominici testified that when he made the identification in the second lineup, Det. McElrath told him that he had chosen the wrong man because that man was not the suspect whose fingerprints were matched to evidence seized from the scene. Mr. Domini-ci admitted that when he identified Mr. Jones from the first lineup, he told the detective that Mr. Jones’ lips in the photograph did not appear to be the same as he remembered from the robbery. He also noted that the scene was dark, and he could have been mistaken about the robber’s lips. He testified that the man did not have facial hair. He also testified that the lineup that he viewed did not show the men’s hairstyles. He testified that only one of the men, the one not holding the gun, actually got into his car, but both of them searched through his possessions inside the car. He testified that his car was not dusted for fingerprints.
Mr. Dominici testified that while he was with Det. McElrath, they learned that a white car had been stopped nearby containing four African-American males. The police officer took him to the scene, where he viewed the men and told the police officer that none of them robbed him. Mr. Dominici stated that he then looked across Rampart Street and saw that the Kia had been parked on the street.
Mr. Dominici identified Mr. Jones in court as the robber with the gun.
Det. McElrath testified that he investigated the armed robbery of Mr. Dominici. He recounted what he was told about the robbery and stated that he interviewed Mr. Dominici on the scene. He testified that crime lab officers seized a vodka bottle from the doorway from which the perpetrators came to rob Mr. Dominici. He stated that Mr. Dominici described the gunman as an African-American male with a brown to dark brown complexion, thin, young, 5'6" to 5'9", with dreadlocks with gold or brown tips.
|4Pet. McElrath testified that a similar robbery occurred in the area a week before, involving three perpetrators, and one of the perpetrators, Curtis Ray, was apprehended, while the other two robbers remained at large. He testified that a police officer involved in that robbery investigation gave him a list of Mr. Ray’s known associates. He testified that one of these associates, Diamond Jackson, had been arrested in the past with Mr. Jones. He pulled up booking photographs of these men and discovered that Mr. Jones had dreadlocks with gold tips, and his general description matched that of the gunman in the armed robbery of Mr. Dominici. Det. McElrath testified that he compiled a photo lineup consisting of Mr. Jones’ photograph and those of similar men, but none *1205 of the men also had dreadlocks with gold tips. He covered the men’s photographs with paper so that their hair was not visible, and he showed the covered lineup to Mr. Dominici on January 28. From that lineup, Mr. Dominici chose Mr. Jones’ photograph as that of the gunman in the robbery. He then obtained an arrest warrant for Mr. Jones, and other police officers later arrested Mr. Jones.
Det. McElrath testified that the fingerprints on the vodka bottle found at the scene matched those of Juan Parrilla. He compiled a second photographic lineup that included Mr. Parrilla’s photograph and showed it to Mr. Dominici, but he did not identify Mr. Parrilla as the second robber.
On cross-examination, Det. McElrath testified that when viewing the second lineup containing Mr. Parrilla’s photograph, Mr. Dominici chose another photograph and told him that the second robber had hair like the man in that photograph. He testified that the victim did not mention that the gunman had facial hair, but he admitted that all of Mr. Jones’ booking photographs from various arrests showed him with a slight beard. He identified a booking photograph from | r,September 2008, which showed Mr. Jones with dreadlocks with gold tips, and he testified that this was probably the photograph that he used in the lineup. He admitted that as far as he knew, Mr. Jones was an acquaintance of an acquaintance of Mr. Ray, the man apprehended in the unrelated armed robbery. He testified that Mr. Jones was stopped by the police in the past with Mr. Ray, but he was not arrested during that stop. He stated that Mr. Jones had been arrested with Mr. Jackson, who was Mr. Ray’s acquaintance, and at that arrest Mr. Jackson was found with heroin and a gun.
Officer Michael Hamilton testified that he arrested Mr. Jones on January 29, 2009, pursuant to the arrest warrant. He transported Mr. Jones to the Eighth District and turned him' over to a police officer there.
The defense called Eric Tyrell, a supervisor of the Legal Compliance Department for Sprint Nextel Telecommunications. He identified telephone records of a cell phone of Christina Postel, which included calls to a New Orleans number late on January 19 and early January 20, 2009. He stated that one call was made at 9:35 p.m. on January 19 and concluded on January 20 at 12:40 a.m. Another call was made at 12:40 a.m. and concluded at 1:48 a.m. on January 20. The defense introduced the phone records into evidence.
Ms. Postel testified that she is Mr. Jones’ girlfriend and lives in Texas. She stated that Mr. Jones moved back to New Orleans in July 2008, and she called him at least twice a day at his grandmother’s house in the New Orleans area. She identified the phone number that she called on the night of January 19-20 as the land line at Mr. Jones’ grandmother’s house. She testified that Mr. Jones lived with his grandmother and did not have a cell phone. She testified that on the evening of January 19, she called Mr. Jones and spoke with him for over four [ fihours, and she insisted that Mr. Jones was on the line the entire time, except for approximately a minute when he interrupted their conversation to discipline his dog. She insisted that when she called, she only spoke briefly with other members of Mr. Jones’ family. She testified that she remembered calling Mr. Jones on this date because Mr. Jones’ attorney contacted her soon after Mr. Jones’ arrest and asked her about the phone conversation.
Officer Karl Palmer, assigned to the crime lab, testified that he collected a vodka bottle from the scene and lifted three latent fingerprints from the bottle. He sent the prints to the property room.
*1206 Officer Joseph Pollard, a latent print examiner, testified that he received the latent fingerprints lifted from the bottle and compared them to Mr. Jones’ fingerprints. The latent prints did not match the prints taken from Mr. Jones. He testified that about a year later, he matched the latent prints to Mr. Parrilla. He testified that Mr. Parrilla had been arrested in September 2009, on an unrelated charge in Plaquemines Parish.
Gaynel Jones testified that she is Mr. Jones’ grandmother, and he lived with her in Gretna prior to his arrest. She identified her telephone number, which belonged to a landline in her house. She testified that handsets for the line did not work past her driveway. She denied that Mr. Jones owned a cell phone when he lived with her. She stated that Ms. Postel, whom she identified as Mr. Jones’ girlfriend, generally called the house two or three times a day. She testified that she remembered that Ms. Postel called the house on January 20 because she was watching the Inaugural Ball on the television, but she did not know how the telephone call lasted. She testified that she would have been sleeping when Ms. Postel called at 12:40 a.m., and she would have been sleeping at the time of the 17robbery in this case. She stated that Mr. Jones was at home that night; she maintained that he never left the house any weeknight after she returned home at 5:00 p.m.
Mr. Jones denied robbing Mr. Dominici, denied being on Natchez Street at the time of the robbery, and denied seeing Mr. Dominici before. He testified that at the time of the robbery, he was living with his grandmother. He stated that on that date, Ms. Postel called him, and they spoke for hours. He insisted that he had worn dreadlocks and a beard for over two years. He admitted that sometime in 2008, his cousin dyed the tips of his dreadlocks blonde, but he maintained that a friend dyed them back to black in November 2008. He stated that he had been unable to touch-up his hair while in jail, and the blonde tips had begun to show by the time of trial. He denied knowing Mr. Parrilla and denied riding in a white Kia. He testified that while he was in jail, he remembered he was on the phone with Ms. Postel around the time of the robbery, and he asked her to check her cell phone records to determine if they showed that they were talking on the phone at the time of the robbery. Ms. Postel then gave this information to his attorneys.
At the conclusion of the testimony, the trial court judge reviewed the evidence adduced at trial, noting that it had reviewed Ms. Postel’s cell phone records. The trial court judge found that the records indicated several “undetermined routed calls” of “less than 32 seconds, 33 seconds” during the pertinent time period, which the trial court judge found to “mean that there was an open line, that this was a planned alibi, so to speak, of a phone call to Mr. Jones that night.” The trial court judge also noted that, contrary to Ms. Jones’ and Ms. Postel’s testimony, the number of phone calls between the two numbers lessened | ^greatly just after the date of the robbery. The trial court judge then found Mr. Jones guilty of armed robbery.

ERRORS PATENT

By his sole assignment of error, Mr. Jones requests a review of the record for errors patent. Counsel complied with the procedures outlined by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted by this Court in State v. Benjamin, 573 So.2d 528 (La.App. 4th Cir.1990). Counsel filed a brief complying with State v. Jyles, 96-2669 (La.12/12/97), 704 So.2d 241. Counsel’s detailed review of the procedural his *1207 tory of the case and the facts of the case indicate a thorough review of the record. Counsel moved to withdraw because she believes, after a conscientious review of the record, that there is no non-frivolous issue for appeal. Counsel reviewed the record and found no trial court ruling that arguably supports the appeal. A copy of counsel’s brief was forwarded to Mr. Jones, and this Court informed him that he had the right to file a brief in his own behalf. He failed to do so. Thus, this Court’s review is limited to errors on the face of the record. La.C.Cr.P. art. 920.
As per State v. Benjamin, this Court performed an independent, thorough review of the pleadings, minute entries, and the bill of information in the appeal record. 573 So.2d at 531. Mr. Jones was properly charged by bill of information with armed robbery in violation of La. R.S. 14:64, and the bill of information was signed by an assistant district attorney. Mr. Jones was present and represented by counsel at arraignment, during trial, and at sentencing. The jury’s verdict is legal in all respects. Furthermore, a review of the trial transcript shows that the State provided sufficient evidence to prove beyond a reasonable doubt that Mr. Jones was guilty of armed robbery, as found by the court.
19However, this Court’s review reveals that the trial court judge failed to specify that the sentence is to be served without benefit of parole, probation, or suspension of sentence as mandated by La. R.S. 14:64. Thus, the sentence without prohibition of benefits is illegally lenient. However, as per La. R.S. 15:301.1 A and State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with these restrictions of benefits, even in the absence of the trial court’s failure to delineate them. Thus, there is no need for this court to correct the sentence. See State v. Phillips, 03-0304 (La.App. 4 Cir. 7/23/03), 853 So.2d 675.
Our independent review reveals no non-frivolous issue and no trial court ruling that arguably supports the appeal. Therefore, we affirm Mr. Jones’ conviction and sentence. We also grant appellate counsel’s motion to withdraw.
MOTION TO WITHDRAW GRANTED; AFFIRMED

. On the same date, Mr. Jones pled guilty as charged to one count of possession of heroin and received a sentence of five years at hard labor, to be served concurrently with the sentence in this case.